# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ZARA MOSS, | No. 4:22-CV-00529 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| THE PENNSYLVANIA STATE UNIVERSITY and MAESTRO WEISLAW GLON (in his individual and official capacities), | |
| Defendants. | |

## MEMORANDUM OPINION

### FEBRUARY 1, 2023

Plaintiff Zara Moss, a former collegiate fencer, brings this action against the Pennsylvania State University and its head fencing coach, Weislaw Glon. Moss alleges that Glon continually harassed her throughout the four years she fenced for Penn State because she is a woman. She also claims that Penn State knew about Glon's harassment and did nothing in response, violating Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681-1688. Moss also brings several state-law claims against Penn State and against Glon individually predicated on Glon's alleged misconduct.

Penn State and Glon both move to dismiss this action. Penn State argues that it did not know about Glon's harassment and therefore did not violate Title IX. Based on the facts alleged in Moss's complaint, the Court agrees with Penn State.

Therefore, it will grant Penn State's motion in part and dismiss Moss's federal claim. The Court declines to exercise jurisdiction over Moss's state-law claims and will accordingly deny Glon's motion as moot.

## I.   BACKGROUND

### A.   Moss's Fencing Career

Moss began her collegiate fencing career in July 2016, when she was offered a full scholarship to fence for Penn State.[1] Glon is the head coach of both Penn State's men's and women's fencing teams.[2] During Moss's first year at Penn State, Glon disparaged her and other female fencers about their weight, claiming that female fencers should be "skinny."[3] This led Moss to lose a substantial amount of weight and develop an eating disorder by October 2017.[4] Glon did not make similar comments about male fencers' weight.[5]

Glon also heavily criticized Moss's fencing performance, causing her to suffer from anxiety and panic, which then required her to take medication.[6] He did not criticize the men's team nearly as much as the women's team.[7] When the women's team placed second at a National Collegiate Athletics Association ("NCAA")

---

[1]    First Amended Complaint ("FAC"), Doc. 18 ¶ 9.
[2]    *See id.* ¶ 2-3.
[3]    *Id.* ¶ 11.
[4]    *Id.*
[5]    *See id.*
[6]    *Id.* ¶ 12.
[7]    *See id.* ¶¶ 12-13.

tournament, he berated them for failing to come in first place like the men's team and explained the women's failure as a consequence of their menstrual cycles.[8]

At some point during her first year, Moss developed a concussion.[9] Glon prohibited her from seeking medical attention and forced her to train while routinely allowing, even encouraging, male fencers to seek treatment and take time to recover from similar injuries.[10] He dismissed complaints from female fencers as overly dramatic or a consequence of their female hormones.[11] Later during Moss's first year, Glon forced her to fence him without protective gear, leaving her with bruises and scars.[12]

During Moss's second year, she underwent surgery for an ankle injury.[13] Moss had also gained weight since her first year, which Glon criticized constantly.[14] He then forced Moss to return to competing too soon after her surgery, impeding her recovery.[15] He blamed her slowed recovery on her weight.[16] Glon acknowledged that Moss's weight loss was unhealthy, but maintained that women "were supposed to

---

[8]  *See id.*
[9]  *See id.* ¶ 14.
[10]  *Id.*
[11]  *Id.*
[12]  *Id.* ¶ 15.
[13]  *Id.* ¶ 18.
[14]  *Id.*
[15]  *Id.*
[16]  *Id.*

be thin."[17] Like Moss's first year, Glon never made comments about male fencers' weight during her second year.[18]

Moss's performance began to suffer.[19] Glon blamed it on her sex.[20] He constantly screamed at Moss, the other women fencers, and the women volunteer coaches.[21] Meanwhile, he maintained friendly relationships with male coaches and fencers.[22] Moss competed in the same NCAA tournament she attended her first year, again finishing in second place.[23] Glon criticized her and the women's team, telling them they were not as skilled as the men's team and blaming their performance on their hormones and menstrual cycles.[24]

During Moss's third year, she struggled with a wrist injury.[25] Glon accused her of faking the injury and criticized her work ethic.[26] However, when a male fencer was similarly injured, Glon encouraged him to rest to allow his wrist to recover.[27] When Moss asked for similar relief, Glon refused and forced her to continue.[28] Later that year, Moss was struggling with a leg injury from constant repetitive exercise.[29]

---

[17]   *Id.*
[18]   *Id.*
[19]   *See id.* ¶ 20.
[20]   *See id.*
[21]   *Id.*
[22]   *Id.*
[23]   *Id.* ¶ 21.
[24]   *Id.*
[25]   *Id.* ¶ 22.
[26]   *Id.*
[27]   *Id.*
[28]   *Id.*
[29]   *Id.* ¶ 23.

A Penn State physician advised her to rest.[30] Glon refused to allow her to see that physician again and falsely told her that she was medically cleared to practice.[31] When a male fencer had a similar injury, Glon had him sit out of practice and tournaments so he could heal.[32] Glon's critical comments on Moss's appearance and weight continued, as did Moss's eating disorder.[33]

Throughout Moss's fencing career, Glon treated men and women differently. He expected female fencers to do their hair and wear makeup to tournaments but did not have similar aesthetic expectations for males.[34] At one point, he called Moss "disgusting" for not shaving her legs.[35] He constantly blamed the women's menstrual cycles to support his belief that their performance was unreliable while never commenting on male fencers' bodies.[36] When female fencers had "minor infraction[s]," Glon "publicly shamed them or stripped them of their leadership titles."[37] When male fencers were accused of sexual assault, Glon did nothing.[38] Glon also assigned female fencers tasks like sewing and patching both the men's and women's teams' equipment and stocking the snack table.[39]

---

[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.* ¶ 24.
[34] *Id.* ¶ 30.
[35] *Id.* ¶ 31.
[36] *Id.* ¶ 33.
[37] *Id.* ¶ 35.
[38] *See id.*
[39] *Id.* ¶ 37.

**B.      Moss Informs Penn State About Glon's Conduct**

In March of Moss's third year, she scheduled a meeting with Bob Boland, Penn State's Athletics Integrity Officer.[40] The meeting took place on March 17, 2021.[41] Moss told Boland about Glon's overly critical comments towards the women and how Glon forced the women to compete while injured.[42] When she referenced how Glon treated male and female fencers differently, Boland responded "that Penn State compliance had already received numerous reports of sexism from [Glon] on the fencing team."[43] Boland then asked Zara to wait and schedule another meeting with him after that year's NCAA tournament to avoid "'rocking the boat' before the national championship."[44]

On April 7, 2021, following the NCAA tournament, Moss again met with Boland, Matt Stolberg, Penn State's Associate Athletics Director for Compliance, and Christopher James Harris, Penn State's Title IX investigator and compliance specialist.[45] At the meeting, Moss further recounted Glon's behavior.[46] Boland remarked that Glon's "differential treatment of men and women fencers could support a Title IX claim and warranted further investigation."[47] But when Moss

---

[40]   *Id.* ¶ 25.
[41]   *Id.*
[42]   *Id.*
[43]   *Id.* ¶ 26.
[44]   *Id.*
[45]   *Id.* ¶ 27.
[46]   *Id.*
[47]   *Id.*

expressed her belief that Glon should be removed, Bolan responded, "well, it's hard to find fencing coaches."[48] Moss never heard from Boland or Penn State again.[49]

## C.    Procedural History

Moss sues both Penn State and Glon for common-law negligence (Count II)[50] and both negligent and intentional infliction of emotional distress (Count IV).[51] Additionally, she sues Penn State for violating 20 U.S.C. § 1681 of Title IX (Count I)[52]; failing to adequately train or supervise Glon (Count III)[53]; and for its vicarious liability for Glon's tortious acts (Count V)[54]. Moss seeks both compensatory and punitive damages, as well as attorney's fees and costs.[55] She also requests injunctive relief, asking the Court to order Penn State "to perform a thorough investigation into Glon's past and ongoing treatment towards former and current women Penn State fencers."[56]

Penn State and Glon move to dismiss the FAC for failing to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).[57] Both motions have been fully briefed and are now ripe for disposition.

---

[48] *Id.*
[49] *Id.*
[50] FAC, Doc. 18 ¶¶ 65-82.
[51] *Id.* ¶¶ 90-108.
[52] *Id.* ¶¶ 54-64.
[53] *Id.* ¶¶ 83-89.
[54] *Id.* ¶¶ 109-14.
[55] *Id.* at 30.
[56] *Id.*
[57] PSU MTD, Doc. 19; Glon MTD, Doc. 21.

## II.   LAW

Under Rule 12(b)(6), the Court dismisses a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the Supreme Court of the United States' landmark decisions *Bell Atlantic Corp. v. Twombly*[58] and *Ashcroft v. Iqbal*,[59] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[60]

The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[61]

## III.   ANALYSIS

### A.   Moss Fails to State a Plausible Title IX Claim

Count I of the FAC alleges a violation of section 1681 of Title IX. Section 1681 provides that no person shall be "excluded from participation in, be denied the

---

[58]   550 U.S. 544 (2007).
[59]   556 U.S. 662 (2009).
[60]   *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).
[61]   *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance" on the basis of that person's sex. "Title IX provides just one *express* enforcement mechanism: action through federal agencies."[62] But the Supreme Court held that it also implies a private right of action.[63] That right of action allows a private plaintiff to bring a claim for a hostile educational environment, akin to the hostile work environment claim cognizable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*[64]

To adequately plead a Title IX hostile educational environment claim predicated on sexual harassment, a plaintiff must plausibly allege (1) she suffered sexual harassment "'so severe, pervasive, and objectively offensive' that it deprived her of 'access to the educational opportunities or benefits'" provided by the institution, and (2) the institution was "'deliberately indifferent' to known acts" of sexual harassment.[65] An institution acts with deliberate indifference when its "response to the harassment . . . is clearly unreasonable in light of the known circumstances."[66]

Importantly, the Supreme Court in *Gebser v. Lago Vista Independent School District* held an institution can only be held liable for conduct once an "appropriate

---

[62]   *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 559 (3d Cir. 2017) (citing 20 U.S.C. § 1682).

[63]   *Cannon v. University of Chicago*, 441 U.S. 677, 717 (1979).

[64]   *Doe by and through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 534, 534 n.103 (3d Cir. 2018) (citing *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999)).

[65]   *Yan Yan v. Penn State Univ.*, 529 F. App'x 167, 171 (3d Cir. 2013) (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)).

[66]   *Davis*, 526 U.S. at 649.

person" has actual knowledge of discriminatory conduct.[67] In the Title IX context, an "appropriate person" is "an official of the [institution] with authority to take corrective action to end the discrimination."[68]

### 1.   The Continuing Violation Doctrine Generally Applies to Title IX Hostile Educational Environment Actions

Penn State first argues that most of the conduct underling Moss's Title IX claim is not actionable because it occurred outside the statute of limitations.[69] In Pennsylvania, the applicable statute of limitations for a hostile education environment claim is two years.[70] Moss responds that her claims are subject to the continuing-violation doctrine.[71] That doctrine is an equitable exception to the statute of limitations that allows a plaintiff to seek relief for all the acts that make up one pattern of unlawful discrimination without regard to the limitations period so long as one alleged act within the pattern takes place inside the limitations period.[72] Its origin is in Title VII hostile work environment jurisprudence.[73] But the Third Circuit

---

[67]   524 U.S. 274, 290 (1998) (citing 20 U.S.C. § 1682)
[68]   *Id.*
[69]   Penn State MTD Br., Doc. 27 at 8-9.
[70]   *Doe*, 850 F.3d at 566.
[71]   Moss Opp. Br. to Penn State MTD, Doc. 33 at 3-6.
[72]   *Doe*, 850 F.3d at 567.
[73]   *See id.* (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013)). The doctrine also applies to torts. *See Sugar Bowl Ranch, LLC v. SWN Prod. Co.*, LLC, 2022 WL 4472452, at *5 (M.D. Pa. Sept. 26, 2022) (applying the doctrine to a conversion claim). It is worth noting that courts do not apply the doctrine to discrete independently actionable instances of conduct, such as retaliation or *quid pro quo* harassment. *See Doe*, 850 F.3d at 566. But Moss does not allege that Glon retaliated against her or engaged in *quid pro quo* harassment.

has left the doctrine's applicability to Title IX sexual harassment claims "an open question."[74]

The parties seek an answer to that question here. For the following reasons, the Court concludes that the doctrine does apply to Title IX claims like the one Moss alleges. Penn State argues that the doctrine does not apply to Title IX claims, citing decisions of several district courts both inside and outside of this circuit.[75] But all of the decisions Penn State cites to in support appear to assume the doctrine applies to Title IX claims without extensive discussion of the question, with nearly all concluding that the facts did not warrant applying the doctrine.[76]

In *Folkes v. New York College of Osteopathic Medicine of New York Institute of Technology*—the only decision Penn State cites to that substantively discusses whether the doctrine applies to Title IX claims—the Eastern District of New York expressed doubt that the doctrine applied but still went on to conclude that the allegations before the court did not establish a continuing violation.[77] That court viewed the continuing-violation doctrine to "be a poor fit with the goals of Title IX"

---

[74]   *Doe*, 850 F.3d at 567.

[75]   Penn State Reply Br., Doc. 44 at 3-6.

[76]   *See Flood v. Natl. Collegiate Athletic Assn.*, 2015 WL 5785801, at *6 (M.D. Pa. Aug. 26, 2015) (applying the doctrine but concluding there was no continuing violation); *Sharp v. Kean U.*, 153 F. Supp. 3d 669, 676 n.4 (D.N.J. 2015) ("[The plaintiff] contends that her claims are timely because she has suffered a 'continuing tort,' but she does not plead any facts supporting such a theory."); *Jones v. Allegheny College*, 2014 WL 2949504, at *3 (W.D. Pa. July 1, 2014) ("[The plaintiff's] complaint is devoid of any allegations of discrimination that could be characterized as continuing in nature.").

[77]   214 F. Supp. 2d 273, 288-89 (E.D.N.Y. 2002). Our Court of Appeals cited to *Folkes* as an example of a decision concluding that the continuing-violation doctrine did not apply to Title IX claims. *Doe*, 850 F.3d at 566 (citing *Folkes*, 214 F. Supp 2d at 288-91).

because of the differences between Title IX and Title VII.[78] Title IX is a "contractual framework" in which the federal government offers funding to educational institutions subject to certain conditions.[79] One of those conditions is the prevention of sexual discrimination.[80]

That stands in contrast to Title VII, which is a comprehensive antidiscrimination mandate that broadly aims to "eradicate discrimination throughout the economy."[81] Therefore, "whereas Title VII aims centrally to compensate victims of discrimination" and to "make persons whole for injuries suffered through past discrimination," Title IX "focuses more on protecting individuals from discriminatory practices carried out by recipients of federal funds."[82]

Congress also enacted Title IX and Title VII from different sources of authority. It enacted Title IX pursuant to its spending power[83] and enacted Title VII

---

[78]   214 F. Supp. 2d at 288.

[79]   *Id.*; *see also Gebser*, 524 U.S. at 286-87 (observing that like Title VI, "[Title IX] condition[s] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds.").

[80]   *See id.*; 20 U.S.C. § 1681.

[81]   *Folkes*, 214 F. Supp. 2d at 288 (quoting *Gebser*, 524 U.S. at 286-87); *see also Gebser*, 524 U.S. at 286 ("That contractual framework distinguishes Title IX from Title VII, which is framed in terms not of a condition but of an outright prohibition.").

[82]   *Id.* (quoting *Gebser*, 524 U.S. at 287). In *Gebser*, the Supreme Court also noted that the difference between Title IX and Title VII explains why the *Cannon* Court only referenced injunctive relief, not money damages, when holding that Title IX implied a private right of action. *See* 524 U.S. at 287.

[83]   *Gebser*, 524 U.S. at 287.

from its power to regulate interstate commerce.[84] That distinction is important because "Title IX's contractual nature has implications for [a court's] construction of the scope of available remedies."[85] "When Congress attaches conditions to the award of federal funds under its spending power, as it has in Title IX," courts should "examine closely the propriety of private actions holding the recipient liable in monetary damages for noncompliance with the condition."[86]

Title IX's "express system of enforcement"—suits by the United States—has two important protections for regulated institutions: "notice to the recipient and an opportunity to come into voluntary compliance."[87] As the Supreme Court observed in *Gebser*, to allow a private plaintiff suing under an implied cause of action to circumvent those protections would be "unsound."[88] That conclusion led the Court to require, as preconditions to Title XI liability, that institutions have "actual knowledge" of the alleged discriminatory conduct and respond with to the conduct with "deliberate indifference."[89]

---

[84] *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 81 (3d Cir. 2003) (citing *EEOC v. Ratliff*, 906 F.2d 1314, 1315-16 (9th Cir. 1990)).

[85] *Gebser*, 524 U.S. at 287.

[86] *Id.* (citing *Franklin v. Gwinnett Cty. Pub. Schools*, 503 U.S. 60, 74-75 (1992)).

[87] *Id.* at 289; *see* 20 U.S.C. § 1682.

[88] *Gebser*, 524 U.S. at 289; *see also Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 180 ("[I]t would be 'anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action'" (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 736 (1975)) (cited in *Gebser*)).

[89] *Gebser*, 524 U.S. at 290.

In some sense, the actual-knowledge requirement is similar to a statute of limitations in how it temporally delimits an institution's Title IX liability. An institution cannot be held liable for actions that took place outside the limitations period or for actions that took place before it had actual knowledge. It appears that the court in *Folkes* reasoned that the continuing violation doctrine would frustrate the actual-knowledge requirement because it might allow a plaintiff to aggregate discriminatory actions that both fell outside the limitations period *and* occurred before the institution had actual notice.[90] Therefore, as a judicial creation, the doctrine must bow to Congress' intent that only institutions with actual knowledge of discriminatory conduct face liability under Title IX.[91]

This Court respectfully disagrees. The continuing violation doctrine can be applied in manner consistent with Title IX's actual-knowledge and deliberate-indifference requirements. Consider an example. A student plaintiff claims a hostile educational environment premised on sexual harassment over the span of four years. She alleges that one individual continually harasses her throughout the four-year period in a persistent pattern. Right after that four-year

---

[90]   *See Folkes*, 214 F. Supp at 289 ("[T]he Supreme Court's reluctance to extend the reach of Title IX beyond that imposed by Congress . . . led the *Gebser* Court to impose the actual notice standard discussed [above] and leads this court to question the advisability of applying the oft-disfavored continuing violation exception to Title IX claims.")

[91]   *See id.*; *see also Gebser*, 524 U.S. at 290 ("Where a statute's express enforcement scheme hinges its most severe sanction on notice and unsuccessful efforts to obtain compliance, we cannot attribute to Congress the intention to have implied an enforcement scheme that allows imposition of greater liability without comparable conditions.").

period, she brings a suit in a jurisdiction where the applicable statute of limitations is two years. She plausibly alleges the school had actual knowledge of the conduct immediately after the first year and acted with deliberate indifference during the other three.

In such a case, the continuing-violation doctrine would allow the student to seek recovery for discriminatory actions occurring in the second year even though they fall outside the limitations period. That is because the school obtained actual knowledge of the misconduct before the second year began and the discriminatory actions are part of the same pattern of harassment perpetrated by the same individual. But actions occurring in the first year cannot be the basis for the school's Title IX liability because they occurred before the school had actual knowledge of the problem.[92] Put differently, even though the first-year conduct is part of a continuing pattern of harassment, it is not part of a continuing *violation*, because there is no Title IX violation until the school has actual knowledge of the problem.[93]

Of course, one might argue that the date of actual notice must be within the applicable limitations period and no recovery can be had for any events outside the limitations period.[94] But that would defeat the purpose of the continuing violation doctrine. If the school had actual notice within the limitations period, all

---

[92]  *See M.S. by and through Hall v. Susquehanna Township Sch. Dist.*, 969 F.3d 120, 129 (3d Cir. 2020) (holding that a plaintiff could not recover for acts occurring before the school district had actual knowledge).

[93]  *See id.*; *Gebser*, 524 U.S. at 290-92.

[94]  Penn State does not appear to make that argument, however.

discriminatory acts following notice would be within the limitations period. Actions outside that period could not be a basis for liability because the school did not have notice of them. Nevertheless, multiple courts, including the Courts of Appeals for both the Second Circuit and Ninth Circuit, have applied the doctrine to Title IX hostile educational environment claims, strongly suggesting that the date of actual notice may fall outside the limitations period.[95] Having concluded that the doctrine applies to hostile educational environment claims, the Court now turns to determining whether it applies to Moss's claim.

### 2. Moss Fails To Establish Penn State Had Actual Knowledge of Glon's Misconduct Before the March 17, 2021, Meeting With Boland

To show that the continuing violation doctrine applies, a plaintiff must have alleged (1) "at least one act that falls within the statute of limitations" and (2) "many of the acts that occurred prior to the applicable limitations period involved similar conduct by the same individuals, suggesting a persistent, ongoing pattern."[96] The pattern must consist of "more than . . . isolated or sporadic acts of intentional discrimination."[97]

As to the second element, the Court notes that it appears to overlap somewhat with the traditional standard for Title IX sexual harassment liability. A persistent,

---

[95] *See, e.g.*, *Papelino v. Albany College of Pharm. of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011) (quoting *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010)); *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 584 n.2 (5th Cir. 2020).
[96] *Mandel*, 706 F.3d at 167.
[97] *Id.* at 165-66.

ongoing pattern of sexual harassment is likely to be one that is also severe and pervasive. Although these standards overlap, the Third Circuit has held that a properly alleged sexual harassment claim does not automatically become a continuing violation.[98] The additional hurdle for a continuing violation is showing the discriminatory acts are "part of the same unlawful employment practice, meaning they involved 'similar conduct by the same individuals, suggesting a persistent, ongoing pattern.'"[99] By contrast, a general sexual harassment claim looks to the "overall scenario" and does not necessarily require harassment by the same group of individuals or that the pattern of harassing conduct be persistent.[100] But where a plaintiff alleges harassment at the hands of one individual based on the same characteristic, as Moss does here, the two inquires begin to collapse into one.

However, as noted above, both inquiries are limited by the actual-knowledge requirement. Moss can only recover for actions that occurred after Penn State had actual knowledge of Glon's behavior. The FAC alleges that Moss met with Bob Boland, Penn State's Athletic Integrity Officer, to report Glon's misconduct on March 17, 2021.[101] The FAC further alleges that in response to Moss's complaint, Boland stated that "Penn State compliance had already received numerous reports

---

[98]   *See West v. Philadelphia Elec. Co.*, 45 F.3d 744, 755 (3d Cir. 1995), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117-18 (2002).

[99]   *Doe*, 850 F.3d at 566 (quoting *Mandel*, 706 F.3d at 167).

[100]  *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 276 (3d Cir. 2001); *see also Castleberry v. STI Group*, 863 F.3d 259, 264-65 (3d Cir. 2017) (noting that a "single isolated incident" of sufficient severity could "create a hostile work environment").

[101]  FAC, Doc. 18 ¶ 25.

of sexism from [Glon] on the fencing team."[102] But Moss faces three problems stemming from the actual-knowledge requirement.

First, although Boland's title suggests he is an "appropriate person" under Title IX, his title alone is an insufficient allegation. That is also true with respect to the other officials Moss met with on April 7, 2021.[103] An institution only has actual knowledge when an appropriate person has actual knowledge.[104] As noted above an "appropriate person" must have the "authority to address the alleged discrimination and to institute corrective measures on the [institution's] behalf."[105] Moss fails to allege any facts regarding Boland's authority to address Glon's misconduct.[106]

Second, although Moss alleges that Boland had already received reports of Glon's misconduct before the March 17, 2021 meeting, her allegations do not plausibly show Penn State had actual knowledge of Glon's behavior based on those prior reports. At no point does Moss identify when Boland received those reports. The date of those reports is a crucial fact in determining Penn State's potential

---

[102] *Id.* ¶ 26.

[103] *Id.* ¶ 27 (alleging that Moss met with and complained to "Matt Stolberg, Penn State's Associate Athletics Director for Compliance, and Christopher James Harris, Penn State's Title IX investigator and compliance specialist"). Moss fails to allege any facts regarding the authority of those individuals as well.

[104] *See Gebser*, 524 U.S. at 290.

[105] *Id.*

[106] The Court acknowledges that Moss's failure is a fairly technical defect. Boland's faculty webpage on Penn State's public website explains that he is "charged with oversight and reporting of internal and external investigations into athletics." *See* Robert A. Boland, PENN STATE LAW, *available at* https://pennstatelaw.psu.edu/faculty/boland. Although plausibly alleging that Boland is an appropriate person for Title IX purposes does not appear to be a daunting task, it is Moss's responsibility as the plaintiff.

liability and, as noted above, how the continuing-violation doctrine applies to Moss's sexual harassment claim. The Court acknowledges the difficulty in obtaining precise information before discovery, but the FAC does not even suggest a range in which Boland received the complaints.

Third, the fact that Boland received "numerous reports of sexism" is substantively inadequate to establish his actual knowledge of Glon's behavior. "An appropriate person has actual knowledge of Title IX discrimination when she is aware of known acts of discrimination."[107] "But this standard may be satisfied only if [an educational institution] knows facts showing a school official poses a substantial danger to students."[108] "Information suggesting the mere 'possibility'" of Glon's sexual harassment is insufficient to plausibly allege a Title IX sexual harassment claim.[109] Without any information as to the substance of the reports Boland received prior to March 17, 2021 the FAC fails to plausibly allege the reports put Boland on notice of "known acts of discrimination" or facts showing that Glon posed a substantial danger to Moss.[110]

---

[107] *M.S.*, 969 F.3d at 128 (citing *Davis*, 526 U.S. at 643).

[108] *Id.* at 128-29 (citing *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 361 (3d Cir. 2005)).

[109] *Id.* at 129 (quoting *Bostic*, 418 F.3d at 360-61); *see also Connelly*, 809 F.3d at 786 ("Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully,'" (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal*, 56 U.S. at 678)).

[110] *Id.* It is unclear whether Moss also relies on a previous incident where George Abashidze, Penn State's former assistant fencing coach, harassed Jennifer Oldham, a non-Penn State fencing coach to show that Penn State had actual notice of Glon's behavior. *See* FAC, Doc. 18 ¶ 34. The alleged misconduct occurred in December 2017. *Id.*; *see also Oldham v. Pennsylvania State Univ.*, 2022 WL 1528305, at *1-4 (M.D. Pa. May 13, 2022). In any event, Moss cannot rely on allegations that a different coach abused a non-student to show that Penn State had

The inadequacy of Moss's allegations regarding the pre-March 17, 2021 reports also precludes application of the continuing-violation doctrine to her Title IX claim. Assuming Boland is an appropriate person under Title IX, Moss's reports of abuse at the March 17, 2021 meeting likely put Boland on actual notice of Glon's harassment.[111] But March 17, 2021 falls within the limitations period.[112] Therefore, Moss cannot base her Title IX claim on anything Glon did before March 17, 2021. As any misconduct occurring after March 17, 2021 falls within the limitations period, there is no need for the continuing violation doctrine because pre-March 17, 2021 conduct is not actionable.

### 3. Moss Fails to Plausibly Allege Any Actionable Conduct Following the March 17, 2021, Meeting With Boland

Penn State next argues that Moss fails to allege she was subjected to any harassment after the March 17, 2021 meeting.[113] It therefore argues that Moss did not suffer any harassment that Penn State responded to with deliberate indifference.[114] Moss responds that she did allege additional harassment.[115] The Court respectfully disagrees.

---

knowledge of facts showing that Glon posed a danger to Moss. *See Oldham*, 2022 WL 1528305, at *26 (noting that Oldham has "no direct connection to Penn State").

[111] FAC, Doc. 18 ¶¶ 25-26.

[112] The FAC was filed on July 15, 2022 and the applicable limitations period is two years. *See Doe*, 850 F.3d at 566.

[113] Penn State MTD Br., Doc. 27 at 16-17.

[114] *Id.*

[115] Moss Opp. Br. to Penn State's MTD, Doc. 33 at 15-16.

Moss relies on paragraphs 23 and 24 of the FAC to show she was subjected to Glon's abuse after the March 17, 2021 meeting.[116] Both fall underneath the heading "[Moss's] Junior and Senior Years (2019-2021)."[117] They detail conduct that appears to have occurred during the "Spring semester of [Moss's] junior year" but do not indicate when the Spring semester began or ended. In paragraph 23, Moss alleges Glon prohibited her from seeing the doctor who advised rest again and falsely told her she was medically cleared to practice, while allowing a male fencer with similar injuries to rest and recover.[118] Moss also relies on another allegation under the 2019-2021 heading that Glon "fixated" on her appearance and weight "all the while" and another allegation that "Glon's harassment was 'day in and day out.'"[119]

Putting aside whether the above allegations constitute actionable harassment, the FAC fails to specifically allege when they occurred. The title preceding the relevant paragraphs of the FAC offers no help as it suggests a range of 2019-2021. March 17, 2021, falls within that range but the Court has no way of knowing from the FAC whether Glon's discriminatory actions took place before or after March 17, 2021. The Court recognizes that this matter is at the pleading stage and neither party has had the benefit of discovery. But given the importance of the date Penn State had actual knowledge of Glon's conduct, Moss's vague allegations that she suffered

---

[116] *Id.* at 15 (citing FAC, Doc. 18 ¶ 23).
[117] FAC, Doc. 18 ¶ 23.
[118] *Id.*
[119] Moss Opp. Br. to Penn State's MTD, Doc. 33 at 15 (citing FAC, Doc. 18 ¶¶ 24, 39).

harassment "all the while" and "day in and day out" throughout 2019, 2020, and 2021 are insufficient to plausibly show she was subjected to actionable harassment after March 17, 2021. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[120] The Court has no way of inferring when the conduct alleged in the FAC occurred. Therefore, Moss has not pled a plausible Title IX claim at this time. Dismissal without prejudice is accordingly appropriate.

## B.    The Court Will Decline Jurisdiction Over Moss's Other Claims

As noted above, in addition to one Title IX claim, Moss brings several state-law claims against Penn State and Glon.[121] But Count I, the Title IX claim, is the only claim over which the Court has original jurisdiction.[122] The Court had supplemental jurisdiction over Moss's other claims, as they all arose from the same controversy.[123]

Title 28 U.S.C. § 1367(c)(3) "provides that '[a] district court may decline to exercise supplemental jurisdiction over a claim'" if "the district court has dismissed all claims over which it has original jurisdiction."[124] The Court must determine

---

[120]  *Connelly*, 809 F.3d at 786.
[121]  FAC, Doc. 18 ¶¶ 65-114 (Counts II-V).
[122]  *See* 28 U.S.C. § 1331.
[123]  28 U.S.C. § 1367(a).
[124]  *Annulli v. Panikkar*, 200 F.3d 189, 202 (3d Cir. 1999), *overruled on other grounds by Rotella v. Wood*, 528 U.S. 549 (2000) (quoting 28 U.S.C. § 1367(c)(3)).

whether exercising supplemental jurisdiction is appropriate, considering "judicial economy, convenience and fairness to the litigants."[125] Given the language of section 1367(c)(3), it appears that dismissal of state-law claims is appropriate on the sole basis that the federal claims have been dismissed.[126]

The Court has dismissed Moss's Title IX claim—the only claim over which it had original jurisdiction. As this matter has not progressed beyond the pleadings, the Court finds it appropriate to decline supplemental jurisdiction over Moss's state-law claims at this time. The Court will revisit its decision if Moss files an amended pleading curing the defects in her Title IX claim.

## IV.   CONCLUSION

As explained above, although the Court agrees with Moss that the continuing-violation doctrine should apply to Title IX hostile educational environment claims generally, she fails to allege the necessary facts to apply the

---

[125] *New Rock Asset Partners v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1505 (3d Cir. 1996) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726-27 (1966)).

[126] *See Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009) ("Here, the District Court plainly recognized its discretion to retain jurisdiction over [the plaintiff's] remaining state-law claims but, having dismissed all of her federal claims, declined to do so for a reason that Congress explicitly green-lighted under these circumstances."). The Court may also decline jurisdiction pursuant to section 1367(c)(1), which provides that a court may decline jurisdiction if the remaining claims "raise[] a novel or complex issue of State law." With respect to her common-law negligence claims, Moss asks the Court to infer a new common-law duty for colleges and universities that they must "protect [their] student athletes from unreasonable harm by [their] own coaches on university property and at university athletic events." Moss Opp. Br. to Penn State MTD, Doc. 33 at 18-19; *see also id.* at 20-21 (applying the Supreme Court of Pennsylvania's test for finding new common-law duties of care); *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 169 (Pa. 2000). Inferring a new common-law duty of care clearly raises a novel issue of state law. Moss also argues that Penn State's affirmative conduct subjected it to a duty of care, but, in the absence of a federal claim, the Court believes it best that the Pennsylvania courts address these matters.

doctrine to her claim. Beyond that, Moss fails to allege the facts necessary to state a plausible Title IX claim, namely facts that establish when Penn State had actual knowledge of Glon's harassment. Therefore, the Court grants Penn State's motion and dismisses Count I without prejudice. As the Court dismissed the only claim over which it had original jurisdiction, it will decline to exercise supplemental jurisdiction over the state-law claims in Counts II through V. Therefore, the Court will deny Glon's motion, which only seeks dismissal of the state-law claims, as moot.

An appropriate Order follows.


BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge