## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ZARA MOSS,

        Plaintiff,

    v.

THE PENNSYLVANIA STATE
UNIVERSITY and MAESTRO
WEISLAW GLON (in his individual
and official capacities),

        Defendants.

No. 4:22-CV-00529

(Chief Judge Brann)

### MEMORANDUM OPINION

#### AUGUST 11, 2023

Being a collegiate athlete can involve as much emotion as it does physical ability. Students who have just reached maturity must compete in challenging physical trials that often require aggressive training from their coaches to refine their skills. And the more prestigious the sport and level, the more demanding it gets. But even at the highest levels, there's a line that can't be crossed. Plaintiff Zara Moss, a former collegiate fencer, brings this action against The Pennsylvania State University ("Penn State") and its head fencing coach, Weislaw Glon, because Glon crossed that line.

Moss alleges that Glon continually sexually harassed her throughout her entire collegiate fencing career. She further claims that Penn State knew about Glon's harassment and did nothing in response, violating Title IX of the Educational

Amendments of 1972, 20 U.S.C. §§ 1681-1688 and the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States. In addition, Moss brings several direct and vicarious state-law claims against Glon and Penn State premised on Glon's alleged misconduct and Penn State's failure to properly supervise him. Penn State and Glon both move to dismiss Moss' claims. For the following reasons, both of Defendants' motions will be granted in part.

## I.      BACKGROUND

### A.      Underlying Facts

Moss began her collegiate fencing career in July 2016 at Penn State.[1] Glon is the head coach of both Penn State's men's and women's fencing teams.[2] During Moss's first year at Penn State (2017-2018), Glon disparaged her about her weight, claiming that female fencers should be "skinny," causing Moss to lose substantial weight and develop an eating disorder by October 2017.[3] Glon did not make similar comments about male fencers' weight.[4]

Glon also consistently criticized Moss' and the other female fencers' performance, belittling Moss for finishing in second place in the national championship and attributing her performance to her menstrual cycle, while never making similar comments to the male fencers.[5] In fact, Glon would often attribute

---

[1]   SAC, Doc. 52 ¶ 15.
[2]   *See id.* ¶¶ 8-9.
[3]   *Id.* ¶ 17.
[4]   *See id.*
[5]   *Id.* ¶¶ 18-19, 47-48.

both Moss' on-field and off-field actions that he disagreed with to her menstrual cycle.[6] At one point, Glon forced Moss to fence him without protective gear, leaving her with injuries.[7] He never did that to any of the male fencers.[8]

During Moss' sophomore year, beginning in 2018, Glon continued his abuse, making stereotypical comments about Moss' physique and appearance after she gained weight while recovering from an injury.[9] Glon's criticisms of Moss' weight continued throughout both her junior and senior years.[10] Again, he did not make similar comments about the men.[11]

In January 2019, Moss spoke to Carl Ohlson, a Penn State athletics official, "about Glon's abuse and her [resultant] panic attacks."[12] She also informed Penn State sports psychologist, Brendan Carr, "about Glon's physical abuse during her freshman year and her fear of [him]."[13] All the while, Glon's verbal abuse continued. Glon now felt that Moss performed poorly because she didn't have a boyfriend.[14] When Moss ultimately finished in second place at the national championship again, Glon "publicly blamed the women's team's performance on their sex."[15]

---

6    *See id.* ¶¶ 20, 48.
7    *Id.* ¶ 21.
8    *Id.*
9    *Id.* ¶¶ 24, 44-46, 58.
10   *Id.* ¶ 34.
11   *Id.* ¶ 47.
12   *Id.* ¶ 25.
13   *Id.*
14   *Id.* ¶ 26.
15   *Id.* ¶ 27.

During Moss' junior year (2019-2020), she struggled with injuries.[16] "Glon accused her of faking her injuries to get out of practices—calling her 'lazy' and a 'disappointment,'" and refusing to allow her to rest and recover.[17] But Glon allowed a male fencer with similar injuries to rest and recover.[18]

At some point before March 2020, the fencing team attended a training seminar on preventing sexual harassment.[19] During the seminar, a Penn State "Deputy Title IX Coordinator [(the "Coordinator")] indicated that Penn State had received reports about sexual harassment on the fencing team related to Glon."[20] The Coordinator "shared responsibility to address sexual harassment and ensure compliance with Title IX on Penn State's athletics teams."[21] During the training, the Coordinator expressed "that she knew the team had a problem with sexual harassment that 'came from the top,' *i.e.*, Coach Glon."[22]

Throughout her senior year (2020-2021), Moss continued to struggle with injuries.[23] Penn State medical staff advised her that she needed to rest and be monitored by trainers if she continued to fence.[24] But Glon "prohibited [Moss] from seeing the team trainer, contrary to the doctors' recommendation."[25] "Then, in the

---

[16] *Id.* ¶ 29.
[17] *Id.*
[18] *Id.*
[19] *See id.* ¶ 30.
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.* ¶ 32.
[24] *Id.*
[25] *Id.* ¶¶ 33, 57.

weeks leading up to NCAA championships in March 2021, Glon lied to [Moss], reassuring her that she was cleared to practice every day" when she was not.[26] Instead, Glon "told [Moss] that she was not allowed to go to the team's athletic trainers for treatment."[27] But Glon allowed a male fencer to sit out of practice and tournaments in order to heal.[28]

On March 17, 2021, Moss attended a meeting with Robert A. Boland, Penn State's Athletics Integrity Officer, an individual with the "authority to take corrective action on behalf of [Penn State]."[29] At the meeting, Moss reported Glon's abuse.[30] In response, "Boland indicated that Penn State had already received numerous reports that Glon treated women fencers worse than 'the European males' on the team because of their gender."[31]

During the national championship tournament (March 25-28, 2021), Moss fenced through her injuries.[32] "[A]t Glon's behest," Penn State's trainers did not monitor her or attend to her.[33] Following the tournament, Moss again met with Boland and two other Penn State officials charged with Title IX compliance.[34] She

---

[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.* ¶ 35.
[30] *See id.* ¶ 36.
[31] *Id.* ¶ 37.
[32] *Id.* ¶ 38.
[33] *Id.*
[34] *Id.* ¶ 39.

again reported Glon's misconduct.[35] But Penn State never took any responsive action.[36]

As a result of Glon's mistreatment, Moss developed an eating disorder, body dysmorphia, panic attacks, insomnia, and post-traumatic stress disorder in addition to the physical harm she suffered by fencing in an injured state.[37] Her conditions required prescription medications and mental health services.[38]

### B.    Procedural History

In her Second Amended Complaint ("SAC"), Moss brings three Title IX claims against Penn State for: (1) its deliberate indifference before she reported Glon's misconduct (Count I—Pre-Harassment Claim); its deliberate indifference following her report (Count II—Post-Harassment Claim); and its disparate treatment of her (Count III—Disparate Treatment).[39] In addition, Moss sues both Defendants under 42 U.S.C. § 1983 for violating her equal protection rights (Count IV).[40]

In addition to her federal claims, Moss brings several direct and vicarious state law claims. She alleges that Glon was negligent (Count V), and that Penn State is vicariously liable for his negligence and/or was negligent itself (Count VI).[41] She also claims that Penn State was negligently supervised and failed to train Glon

---

[35]   *Id.* ¶ 40.
[36]   *See id.* ¶ 42.
[37]   *See id.* ¶¶ 17, 24-25, 34, 59.
[38]   *Id.* ¶ 59.
[39]   *Id.* ¶¶ 90-99 (Count I), 100-06 (Count II), 107-13 (Count III).
[40]   *Id.* ¶¶ 114-19.
[41]   *Id.* ¶¶ 120-23 (Count V), 124-32 (Count VI).

(Count VII).[42] Lasty, she brings claims for negligent and intentional infliction of emotional distress ("NIED" and "IIED") against Glon and Penn State (Count VIII).[43]

Penn State moves to dismiss the SAC in its entirety under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[44] Glon moves to dismiss only Counts V and VIII, the negligence and NIED claims against him.[45] Both motions have been fully briefed and are now ripe for disposition. For the following reasons, the Court grants both Defendants' motions in part.

## II.   LAW

Under Rule 12(b)(6), the Court dismisses a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the Supreme Court of the United States' landmark decisions *Bell Atlantic Corp. v. Twombly*[46] and *Ashcroft v. Iqbal*,[47] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[48]

The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements

---

[42]   *Id.* ¶¶ 132-39.
[43]   *Id.* ¶¶ 140-52.
[44]   Penn State MTD, Doc. 62.
[45]   Glon MTD, Doc. 61.
[46]   550 U.S. 544 (2007).
[47]   556 U.S. 662 (2009).
[48]   *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[49]

## III.   ANALYSIS

### A.   Moss' Title IX Sexual Harassment Claim

In Counts I and II, Moss brings Title IX claims for the hostile educational environment she endured as a result of Glon's sexual harassment. To adequately plead such a claim, a plaintiff must plausibly allege (1) she suffered sexual harassment "'so severe, pervasive, and objectively offensive' that it deprived her of 'access to the educational opportunities or benefits'" provided by the institution, and (2) the institution was "'deliberately indifferent' to known acts" of sexual harassment.[50]

For an institution to be civilly liable under Title IX, it must have actual notice of known acts of discrimination, as opposed to constructive notice.[51] An institution has actual notice when an individual with authority to take corrective action—an "appropriate person" in Title IX jurisprudence—becomes personally aware of

---

[49] *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

[50] *Yan Yan v. Penn State Univ.*, 529 F. App'x 167, 171 (3d Cir. 2013) (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)).

[51] *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998).

discriminatory conduct.[52] Once an appropriate person has actual notice, an institution can be held civilly liable for further discriminatory conduct to which it responds with deliberate indifference.[53] An institution acts with deliberate indifference when its response to the discriminatory conduct is "clearly unreasonable in light of the known circumstances."[54]

The Court dismissed Moss' prior Title IX sexual harassment claim because she failed to adequately allege that an appropriate person had actual notice of Glon's mistreatment as a result of Moss' March 17, 2021 meeting with Boland.[55] But even assuming that Penn State had actual notice on March 17, 2021, Moss also failed to allege that she continued to face discrimination after Penn State became aware of Glon's conduct.[56]

In the SAC, Moss responded to the Court's previous ruling in two ways. First, she now alleges that Penn State first had actual notice of Glon's conduct in March 2020, as opposed to March 2021, based on the Coordinator's comments during the training seminar. Those allegations form the basis of Count I, Moss' "pre-harassment" claim, which concerns Glon's conduct from the March 2020 meeting until March 17, 2021, when she alleges that she specifically informed Boland that

---

[52]   *Id.* at 290.
[53]   *Id.* at 290-91.
[54]   *Davis*, 526 U.S. at 649.
[55]   *See Moss v. Pa. State Univ.*, 2023 WL 1456773, at *7-8 (M.D. Pa. Feb. 1, 2023) (Doc. 45).
[56]   *Id.* at *9.

Glon mistreated her.[57] Second, Moss alleges that Glon continued to mistreat her and Penn State continued to ignore her grievances about Glon following the March 17, 2021 meeting with Boland. Glon's post-March 17, 2021 conduct is the basis for Count II, Moss' "post-harassment" claim.[58]

Penn State first challenges the sufficiency of Moss' allegation that it had actual notice as a result of the March 2020 comments.[59] It also argues that the alleged harassment in the SAC doesn't constitute the severe and pervasive sex-based treatment necessary to sustain a Title IX claim in this context.[60] It therefore maintains that Count I should be dismissed. As for Count II, Penn State argues that Moss fails to allege additional harassment after the March 17, 2021 meeting and Count II should therefore be dismissed.[61] The Court discusses each of these arguments in turn.

       **1.**      **Whether Penn State Had Actual Notice of Glon's Misconduct as a Result of the March 2020 Sexual Harassment Training**

As to Penn State's first argument, Moss alleges that during the March 2020 sexual harassment training seminar, the Coordinator "indicated that Penn State had received reports about sexual harassment on the fencing team related to Glon."[62]

---

57  *See* SAC, Doc. 52 ¶ 97.
58  *See id.* ¶ 101.
59  Penn State MTD Br., Doc. 65 at 14-18.
60  *Id.* at 8-14.
61  *Id.* at 18-20.
62  SAC, Doc. 52 ¶ 30.

Specifically, the Coordinator expressed "that she knew the team had a problem with sexual harassment that "'came from the top,' *i.e.*, Coach Glon."[63]

Penn State first argues that the SAC fails to plausibly allege that it had actual notice of Glon's misconduct because Moss' allegations fail to show that Penn State had notice that "Glon posed a substantial risk to Moss," in particular.[64] Moss responds that Title IX doesn't require Penn State to have notice of conduct that presented a particular risk to Moss, it only requires that Penn State had notice that Glon presented a danger to students in general. The Court agrees with Moss.

In the Title IX context, "'[a]ctual notice' must amount to 'actual knowledge of discrimination in the recipient's programs.'"[65] Penn State's argument concerns the specificity of the actual-notice standard—whether an institution must have actual knowledge of a substantial danger towards its students generally or of a substantial danger to the plaintiff. In *Bostic v. Smyrna School District*, our Court of Appeals discussed the actual-notice requirement, approving a district court's jury instruction that an educational institution has actual notice "if an appropriate person at the institution has knowledge of facts sufficiently indicating substantial danger to a student so that the institution can reasonably be said to be aware of the danger."[66] Although that language from *Bostic* could be read to indicate that the appropriate

---

[63] *Id.*

[64] Penn State MTD Br., Doc. 52 at 14-16.

[65] *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 360 (3d Cir. 2005) (*quoting Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).

[66] *Id.*

person must have actual knowledge of a substantial danger to a particular "student" to support Title IX liability, it's clear that the proper inquiry is whether the institution had notice of a danger posed to the general student body.[67]

Penn State next challenges the substance of the Coordinator's March 2020 statement. In its prior Memorandum Opinion, the Court held that Moss' reference to "numerous reports of sexism" to an appropriate person was substantively insufficient to allege that Penn State had actual notice of known acts of discrimination.[68] The Court suggested that "reports of sexism" suggest the mere possibility that Glon harassed Moss—which is insufficient under *Bostic*.[69] Penn State argues that the Coordinator's acknowledgement of "reports of sexual harassment on the fencing team related to Glon" is similarly insufficient. The question is close, but the Court disagrees with Penn State.

---

[67]  *See id.* ("An educational institution has actual knowledge if it knows the underlying facts, indicating sufficiently substantial danger to students, and was therefore aware of the danger." (quoting 3C Fed. Jury. Prac. & Instr. § 177.36 (5th ed. 2001))); *M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 129 (3d Cir. 2020) (explaining that the actual-notice standard "may be satisfied only if a school district knows facts showing a school official poses a substantial danger to *students*" (emphasis added)); *C.K. v. Wrye*, 751 F. App'x 179, 184 (3d Cir. 2018) (noting that the record "could support a factfinder's determination that the institutional defendants had actual knowledge that [the teacher] posed a substantial danger to [plaintiff] *and other students*" (emphases added)); *see also Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1154 (10th Cir. 2006) (holding that a school board can receive actual notice from complaints by other students without waiting "until it receives a clearly credible report of sexual abuse from the plaintiff-student") (quoting *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 62 (D. Me. 1999)); *Baynard v. Malone*, 268 F.3d 228, 238 n.9 (4th Cir. 2001) ("We note that a Title IX plaintiff is not required to demonstrate actual knowledge that a particular student was being abused.").

[68]  *See Moss*, 2023 WL 1456773 at *7-8.

[69]  *Id.* (citing *Bostic*, 418 F.3d at 360-61).

To be sure, Moss' new allegation in the SAC is somewhat unspecific. But the relevant pleading standard requires only plausibility, not exacting specificity. Additionally, the Court must also afford Moss, the nonmovant, all reasonable inferences. On the one hand, the Coordinator's receipt of "reports of sexual harassment" sounds conclusory—especially given how the allegation echoes the title of Moss' cause of action. But on the other hand, Penn State's argument would have the Court overlook Moss' allegation that the Coordinator is an individual with "responsibility to address sexual harassment and ensure compliance with Title IX on Penn State's athletics teams"—in other words, an "appropriate person."[70] The Court must take that allegation as true. At this stage, it's reasonable to infer that when an "appropriate person"—one who is responsible for ensuring compliance with Title IX's mandate *against* sexual harassment—indicates that they're aware of sexual harassment, they're referring to known acts of discrimination.[71] That's more than a mere possibility and enough to survive a motion to dismiss.

Next, Penn State contends that the Coordinator's "from the top" comment is insufficiently specific to implicate Glon. Penn State notes that context of the comment (a preventative training seminar in response to Penn State's removal of certain male fencers for sexual assault) "more readily supports an inference that the

---

[70]  SAC, Doc. 52 ¶ 30.
[71]  If discovery reveals that not to be the case, Penn State is welcome to renew its argument in a motion for summary judgment.

'from the top' comment was made in response to the conduct of the removed male fencers."[72]

First, Penn State's argument ignores the first sentence of the operative paragraph in the SAC, which generally alleges that the Coordinator "indicated that Penn State had received reports about sexual harassment on the fencing team related to Glon."[73] That is a sufficient factual allegation notwithstanding the "from the top" comment.[74] Second, Penn State's argument about which inference is more "readily supported" ignores the operative pleading standard, under which the Court takes all reasonable references in favor of Moss—not Penn State.

Accordingly, Moss' allegation that Penn State knew about sexual harassment on the fencing team related to Glon is sufficient to indicate that Penn State had actual knowledge of Glon's misconduct in March 2020.

### 2. Whether Glon's Pre-Harassment Conduct Was Sex-Based

Title IX prohibits sexual harassment, not generalized harassment.[75] Therefore, if the alleged harasser's comments are not based on the plaintiff's sex, there is no Title IX remedy. In that vein, Penn State argues that Glon's conduct is an aggressive

---

[72] Penn State MTD Br., Doc. 52 at 15.

[73] SAC, Doc. 52 ¶ 30.

[74] In any event, the Court thinks it fair at this stage to infer the "from the top" comment to be directed at Glon, the head coach of Penn State's fencing teams.

[75] *See Lansberry v. Altoona Area School Dist.*, 318 F. Supp. 3d 739, 749 (W.D. Pa. 2018) (holding that "intense, persistent, and malicious bullying" was not sexual harassment because "sexual harassment requires a component directly related to one's gender.").

critique on Moss and the female fencers' "toughness" rather than sexual harassment.[76] Again, the Court disagrees.

In support of its "toughness" argument, Penn State cites cases such as *Chisholm v. St. Marys City School District Board of Education*.[77] In *Chisholm*, the Sixth Circuit considered a theory of Title IX liability predicated entirely on a coach's "use of the term 'pussy'" as a "form of sex discrimination due to [the word's] gender-based connotations."[78] Relying on analogous Title VII jurisprudence, the *Chisholm* court rejected the plaintiffs' theory because it didn't involve sexual advances towards the plaintiffs, didn't involve differential treatment of sexes, and didn't indicate that the "defendant was motivated by general hostility to the presence of one sex in the workplace."[79]

The *Chisholm* court concluded that the coach's use of "pussy" didn't constitute sex stereotyping because it reflected a criticism of the male players' toughness, not their inability to appear more masculine.[80] The court therefore concluded that coach's criticism was "worlds apart from the gender-inspired expectations about appearance (such as wearing makeup, jewelry, or certain hairstyles) that loomed large in *Price Waterhouse* [*v. Hopkins*] . . . ."[81]

---

[76]  Opp., Doc. 65 at 9-12.

[77]  *Id.* (citing 947 F.3d 342, 352 (6th Cir. 2020)).

[78]  947 F.3d at 349.

[79]  *Id.* at 350.

[80]  *Id.* at 351-52.

[81]  *Id.* In *Price Waterhouse*, the Supreme Court noted that a company's dismissal of a female employee for failing to act in a sufficiently feminine manner could constitute illegal

But as Moss points out, there is a clear difference between this case and *Chisholm*: the presence of the other sex. The *Chisholm* court noted that the absence of females foreclosed multiple avenues to Title IX liability for the plaintiffs. Here, many of Glon's comments on toughness constitute explicit comparisons between male and female fencers and his actions constitute differential treatment of the male and female fencers.[82] Accordingly, Penn State's "toughness" argument largely falls flat.

Additionally, the Court finds the *Chisholm* court's consideration of sex-based stereotyping distinguishable from this case. Many of Glon's comments are based on well-known and impermissible stereotypical attitudes about women's appearance and bodily functions.[83] Others focus on equally-well known and impermissible stereotypical gender roles.[84] That's sufficient for the purposes of Moss' Title IX claim.

---

discrimination because the dismissal was based on sexual stereotypes about women. *See* 490 U.S. 228, 250-52 (1989) *abrogated on other grounds by* § 107, 105 Stat. 1075.

[82] *See* SAC, Doc. 52 ¶¶ 19 (alleging that Glon screamed at the women's fencing team for coming in second place and never winning the national championship like the men's team did in part because women menstruate), 29 (alleging that Glon referred to injured women as weak and forced them to practice while allowing men to heal), 54 (alleging that Glon punished women more severely than he did men).

[83] *See* SAC, Doc. 52 ¶¶ 23 (alleging that Glon expressed his belief that women were "weak and dramatic"), 24 (alleging that Glon expressed a preference that Moss, as a woman, should be "skinny"), 26 (alleging that Glon believed that Moss "needed a boyfriend"), 27 (alleging that Glon attributed women's inconsistent performance to "hormones and menstrual cycles"); 45-46 (alleging that Glon "expect[ed] the women fencers to be skinny, wear makeup, . . . have perfect hair" and shave any body hair).

[84] *See id.* ¶¶ 48 (alleging that Glon frequently attributed Moss and other women's inadequate performances to their menstrual status), 56 (alleging that Glon held Moss and other women "responsible for sewing and patching equipment for not only themselves, but also for the male fencers" and ensuring the snack table was stocked).

### 3. Whether Glon's Pre-Harassment Conduct was Severe and Pervasive

Moss and Penn State next differ over whether Glon's harassment is sufficiently severe and/or pervasive to support Title IX liability. As expressed above, the origin of Moss's Title IX claim is a Title VII hostile work environment claim.[85] To sustain such a claim, the alleged sexual harassment "must both: (1) be viewed subjectively as harassing by the victim and (2) be objectively severe or pervasive enough that a reasonable person would agree that it is harassment."[86] Penn State argues that Glon's conduct is not sufficiently severe or pervasive to support Title IX liability.[87]

In a Title VII hostile work environment claim, a court looks to the totality of circumstances to assess the extent of the alleged harassment, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with work performance."[88] Determining whether harassment constitutes a hostile environment under Title IX involves virtually the same inquiry; it "'depends on a constellation of surrounding circumstances,

---

[85] *See Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 205 (3d Cir. 2001).
[86] *Id.* (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 (1993)).
[87] Penn State MTD Br., Doc. 27 at 12-14.
[88] *Saxe*, 240 F.3d at 205 (quoting *Harris*, 510 U.S. at 114).

expectations, and relationships,' including, but not limited to, the ages of the harasser and the victim, and the number of individuals involved."[89]

Penn State's argument largely rests on its earlier position that most of Glon's comments are critiques of the female fencers' toughness rather than sexual harassment.[90] It emphasizes the lack of any physical contact between Glon and Moss based on Moss' sex.[91] Moss responds that Glon's near-daily sex-based mistreatment of her and the power dynamic between her and Glon demonstrate the necessary level of severity.[92]

The Court rejected Penn State "toughness" argument above and therefore considers Glon's comments and actions as a whole to determine the extent of his harassment. Through that lens, the Court concludes that Moss sufficiently alleged severe and pervasive harassment. The SAC alleges that Glon verbally abused Moss "day after day and year after year" for four years and provided several examples of the repeated abuse Glon inflicted on Moss and other female fencers.[93]

---

[89] *Id.* at 206 (quoting *Davis*, 526 U.S. at 651).

[90] *See* Penn State MTD Br., Doc. 27 at 13 ("First, as detailed above, the majority of Moss's alleged interactions with Glon were not sex-based. Second, the handful of allegations that could be construed as sex-based relate to sporadic verbal comments or actions that are too isolated and attenuated to constitute 'pervasive' sex-based harassment.").

[91] *Id.* at 14.

[92] Opp., Doc. 73 at 17-18.

[93] SAC, Doc. 52 ¶ 63. The Court agrees with Penn State that Glon's fencing bout with an unequipped Moss does not appear to be based on her sex. But the lack of physical contact is one factor among many to consider. Additionally, the Court acknowledges that some of the SAC's allegations regarding Glon's behavior do not specifically allege that Moss was present or a target. But there are sufficient allegations that Glon's abuse specifically targeted Moss to survive Penn State's motion. Glon's comments about the women's team and/or women in general include Moss. Should discovery prove otherwise, Penn State is welcome to renew its

18

Accordingly, the Court concludes that Moss has plausibly alleged a Title IX sexual harassment claim in Count I and denies that aspect of Penn State's motion to dismiss.

### 4. Whether Moss Continued to Suffer Harassment Following the March 17, 2021 Meeting

Penn State argues that Moss fails to sufficiently allege that she was denied access to educational benefits as a result of Penn State's deliberate indifference to Glon's harassment following the March 17, 2021 meeting with Boland.[94] Penn State therefore argues that Count II should be dismissed.[95] Moss responds that the appropriate inquiry is whether Penn State's indifference left her more vulnerable to harassment even if she did not experience it outright.[96] The Court agrees with Moss.

As our Court of Appeals recently put it in *Hall v. Millersville University*, the proper question is whether Penn State's "deliberate indifference to [Moss'] harassment resulted in her being excluded from participation in, denied the benefits of, or subjected to discrimination under [Penn State's] education program."[97] Put differently by the Sixth Circuit in *Wamer v. University of Toledo*, a plaintiff can state a post-harassment claim by plausibly alleging that she was deprived of education

---

argument. *See Doe v. Sch. Dist. No. 1, Denver, Colorado*, 970 F.3d 1300, 1311-12 (10th Cir. 2020) ("[M]atters of degree—such as severity and pervasiveness—are often best left to the jury. Thus, we have observed that the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact and it is even less suited for dismissal on the pleadings." (internal citation and quotation marks omitted)).

[94]   Penn State MTD Br., Doc. 65 at 18-20.

[95]   *Id.*

[96]   Opp., Doc. 73 at 23-28.

[97]   22 F.4th 397, 409 n.4 (3d Cir. 2022).

benefits available to other students because she "experienced an additional instance of harassment" or "an objectively reasonable fear of further harassment" that causes her "to take specific reasonable actions to avoid harassment" following the institution's unreasonable response to her complaint.[98]

As the *Wamer* court observed, when "a teacher sexually harasses a student, it can more easily be presumed that the harassment would 'undermine[] and detract[] from [the student's] educational experience' because teachers are at the core of a student's access to and experience of education."[99] The same can be said of coaches, who occupy a role similar to teachers when it comes to athletics programs at schools and universities.

Under that legal standard, the SAC certainly passes muster. Penn State's argument in opposition relies on its earlier argument that it didn't have notice of Glon's misconduct prior to the March 17, 2021 meeting. The Court has already rejected that argument above, finding that Penn State had notice that Glon presented a danger to students as of March 2020. As previously discussed, Glon continued to harass Moss following the March 2020 training and treat male fencers more favorably than her and the other female fencers. Accordingly, Moss has plausibly alleged a post-harassment claim in Count II. Penn State relies on the same arguments to advocate for dismissal of Count III, Moss' disparate treatment claim.[100] As the

---

[98]   27 F.4th 461, 471 (6th Cir. 2022).
[99]   *Id.* (quoting *Davis*, 526 U.S. at 651) (alterations in original).
[100]   *See* Penn State MTD Br., Doc. 65 at 20-21.

Court has already rejected those arguments, it concludes that Count III plausibly alleges a disparate treatment claim as well.

### B. Moss' *Monell* Claim

In Count IV, Moss sues Penn State under 42 U.S.C. § 1983 for violating her rights to equal protection under the Fourteenth Amendment.[101] Penn State argues that Moss fails to meet the standard for institutional liability under *Monell v. Department of Social Services of City of New York*. Under the *Monell* standard, institutional public defendants like Penn State cannot be held vicariously liable for the unconstitutional acts of their employees.[102] Rather, they are liable under § 1983 for a policy, practice, or custom that leads to violation of a plaintiff's constitutional rights.[103] Moss appears to allege a custom of deliberate indifference to sexual harassment of student athletes.[104]

---

[101]   There is no dispute that Penn State is a state actor and a "person" within the meaning of § 1983 and no dispute that sexual harassment by a state actor constitutes a violation of the Equal Protection Clause.

[102]   *See Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 724 (3d Cir. 1989) (citing *Monell*, 436 U.S. 658, 691 (1978)).

[103]   *See id.*

[104]   Moss does not appear to allege that Penn State maintained an official policy as there is no reference to an "an official proclamation, policy, or [an] edict" in the SAC. *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). Although Moss generally references Penn State's "policies, customs, and practices" in the SAC, she fails to connect any of her constitutional injuries to an official policy. Indeed, some of the evidence Moss cites in support shows that Penn State failed to have such a policy. *See* SAC, Doc. 52 ¶¶ 82-86 (alleging that the Department of Education's compliance review of Penn State revealed its failure to maintain adequate policies).

In addition to alleging the existence of a policy or custom, "[a] plaintiff must also allege that the policy or custom was the 'proximate cause' of [their] injuries."[105] To show such causation a plaintiff may demonstrate an "affirmative link" between the custom and the constitutional violation by showing that the defendant had knowledge of "similar unlawful conduct in the past, . . . failed to take precautions against future violations, and that [its] failure, at least in part, led to [the plaintiff's] injury."[106] "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury."[107]

Accordingly, Moss must allege that Penn State was aware of past sexual harassment and failed to take precautions against it. That question is simply a broader framing of the inquiry that applies to Moss' Title IX claims. Instead of focusing only on whether Glon presented a danger to students, the standard is whether Penn State had knowledge of sexual harassment by its employees generally.

On top of the Court's conclusion that an appropriate person (the Coordinator) had actual notice of Glon's sexual harassment of fencers based on the March 2020

---

[105] *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)).
[106] *Id.* (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990)).
[107] *Bielevicz*, 915 F.2d at 851 (citing *Black v. Stephens*, 662 F.2d 181, 190-91 (3d Cir. 1981)).

training, the SAC contains additional allegations that show that other Penn State officials—including Robert Boland—knew about Glon's mistreatment as well.[108]

In addition to Moss' specific allegations regarding Penn State's knowledge of and failure to address Glon's misconduct, she cites a letter from the United States Department of Education's Office of Civil Rights (the "OCR Letter") that detailed a Title IX Compliance review of Penn State's procedures that culminated in December 2019.[109] The OCR Letter details numerous failures in Penn State's response to allegations of sexual harassment, including specific failures to address sexual harassment in the Athletics Department.[110] Combined with its specific allegations regarding Glon, the SAC states a plausible *Monell* claim.[111]

---

[108]  *See* SAC, Doc. 52 ¶¶ 25, 87, 37. Although most of these allegations are insufficient to meet Title IX's stringent actual-notice standard, they contribute to an environment of indifference to sexual harassment, which supports Moss' *Monell* claim.

[109]  SAC, Doc. 52 ¶¶ 82-86 (citing OCR Letter (March 26, 2020), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/03146001-a.pdf).

[110]  *See id.*

[111]  *See Roman*, 914 F.3d at 799 (relying in part on a consent decree that followed the plaintiff's constitutional injury to infer that the problems that led to the consent decree (warrantless searches and false arrests) were occurring while the plaintiff was falsely arrested); *Bielevicz*, 915 F.2d at 851 ("If the [municipal defendant] is shown to have tolerated known misconduct by police officers, the issue whether the [its] inaction contributed to the individual officers' decision to arrest the plaintiffs unlawfully in this instance is a question of fact for the jury.").

### C.   Moss' State Law Claims

#### 1.   Moss' IIED Claim

Defendants argue that Moss fails to plausible allege an IIED claim in Count VIII because neither Penn State's nor Glon's conduct was sufficiently outrageous.[112] Unsurprisingly, Moss disagrees.[113] Here, the Court agrees with Defendants.

To recover on an IIED claim, a plaintiff must satisfy four elements: (1) "the conduct must be extreme and outrageous"; (2) "the conduct must be intentional or reckless"; (3) "it must cause emotional distress"; and (4) "the distress must be severe."[114] The outrageous conduct required to support an IIED claim must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."[115] "[C]onduct that deserves the label 'outrageous' is outrageous precisely because it tends to produce distress in normally constituted persons."[116]

A determination of outrageous conduct is fact-sensitive and not best resolved as an issue of law.[117] But the Court must make the initial determination regarding

---

[112] Penn State MTD Br., Doc. 65 at 33-34; Glon MTD Br., Doc. 66 at 11-12.

[113] Opp., Doc. 73 at 44-45.

[114] *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1273 (3d. Cir. 1979) (citing Restatement (Second) of Torts § 46 (1965)).

[115] *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987) (quoting R.2d Torts § 46 cmt. d).

[116] *Hackney v. Woodring*, 622 A.2d 286, 290 (Pa. Super. 1993), *rev'd on other grounds*, 652 A.2d 291 (Pa. 1994).

[117] *See Kazatsky v. King David Meml. Park, Inc.*, 527 A.2d 988, 995 (Pa. 1987) (noting "subjectiveness of the Restatement's concept of 'outrageousness'").

the sufficiency of a plaintiff's allegations.[118] Where reasonable minds differ, the determination is for the jury.[119] In line with their approach to IIED generally, Pennsylvania courts have adopted a narrow view of outrageous conduct and have repeatedly emphasized its rarity.[120]

In support of her argument, Moss relies this Court's decision in *Humphries v. Pennsylvania State University* ("*Humphries* I") denying defendants' motion to dismiss the plaintiff's IIED claim arising out of hazing on Penn State's football team.[121] In *Humphries* I, the plaintiff alleged that the defendants would tell him that they were going to "Sandusky" him, wrestle him to the ground and perform what he described as "humping action[s]" on him, and place their genitalia on his face.[122] Moss asserts that Glon's mistreatment of her "was at least as severe as the hazing at issue in Humphries."[123]

The Court disagrees. Glon's actions are certainly unbecoming of a collegiate athletic professional. But his actions do not meet the high bar of outrageous conduct

---

[118] *Chuy*, 595 F.2d at 1274.

[119] *Id.* at 1274 n.9 (quoting R.2d Torts § 46 cmt. h).

[120] *See, e.g.*, *Kazatsky*, 527 A.2d at 991 ("The availability of recovery under [IIED] is highly circumscribed."); *John v. Phila. Pizza Team, Inc.*, 209 A.3d 380, 383-84 (Pa. Super. Ct. 2019) (holding that repeated use of racial epithets not outrageous conduct) (citing *Dawson v. Zayre Dept. Stores*, 499 A.2d 648, 648 (Pa. Super. Ct. 1985) (same)); *Strain v. Ferroni*, 592 A.2d 698, 703 (Pa. Super. Ct. 1991) (holding that obstetrician's statement "'if you lose it, you lose it,' with reference to [plaintiff's] unborn child" was insufficiently outrageous).

[121] Opp., Doc. 73 at 44-45 (citing 492 F. Supp. 3d 393, 410 (M.D. Pa. 2020)).

[122] 492 F. Supp. 3d at 401.

[123] Opp., Doc. 73 at 45.

and do not rise to the level of mistreatment the plaintiff in *Humphries* I suffered. Accordingly, dismissal of Count VIII is appropriate as to both Defendants.[124]

### 2.    Moss' Negligence Claims

In addition to her federal claims, Moss alleges several state-law negligence claims against Defendants. First, she alleges that Glon was individually negligent in his treatment of her and negligently inflicted emotional distress ("NIED") upon her.[125] She also alleges that Penn State is both directly negligent and vicariously liable for Glon's negligence because his actions occurred within the scope of his employment with Penn State.[126] In addition, Moss brings direct NIED claims against both Glon and Penn State.[127]

The elements of negligence in Pennsylvania are well-settled. A plaintiff must show that the defendant owed them a duty, breached that duty, and by breaching that duty, caused them damages.[128] The claims against both Glon and Penn State first depend on whether either owed Moss a duty of care, which is a question of law to

---

[124] It's clear that Moss is bringing a direct IIED claim against Glon. She also argues that Penn State is vicariously liable for Glon's infliction of emotional distress, but that claim fails because she doesn't adequately allege that Glon behaved outrageously. *See* SAC, Doc. 52 ¶ 144. What's less clear is whether Moss brings a direct IIED claim against Penn State, as many, but not all, of the allegations in Count VIII target "Defendants," rather than Glon individually, and Moss' Opposition fails to reference a direct IIED claim against Penn State. In any event, the Court concludes that Penn State did not engage in outrageous conduct either. Its deliberate indifference to Glon's mistreatment of Moss is certainly problematic, but it does not go beyond the bounds of human decency.

[125] SAC, Doc. 52 ¶¶ 120-23 (Count V—negligence against Glon), 140-52 (Count VIII—NIED).

[126] *Id.* ¶¶ 124-31 (Count VI).

[127] *Id.* ¶¶ 140-52 (Count VIII—NIED).

[128] *Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115, 1126 (Pa. Super. Ct. 2004).

be decided by the Court.[129] Glon argues that he owed no duty to Moss and her negligence claims against him should be accordingly dismissed.[130] Penn State echoes Glon's arguments with respect to the direct negligence claims against it and additionally argues that Glon's misconduct did not occur in the scope of his employment.[131]

The Court first discusses whether Defendants owed Moss a duty of care under several Pennsylvania cases involving students injured in the course of collegiate athletics. It concludes that the facts here are distinguishable from the facts underlying the duties of care found in those cases. Accordingly, Penn State doesn't owe Moss a duty of care that fits the facts supporting her negligence claims against it.  The Court next assesses whether Glon's particular acts give rise to duty under general tort principles. Finding that Glon did undertake a duty, it then considers Moss' NIED claim against him. Lastly, the Court discusses whether Glon's allegedly negligent acts occurred within the scope of his employment as Penn State's fencing coach.

### a. Whether Penn State or Glon Owed Moss a Duty Based on Existing Pennsylvania College-Athlete Jurisprudence

The Court does not write on a blank slate when approaching the existence and scope of the duties coaches and colleges owe their student athletes. Throughout their

---

[129] *See Straw v. Fair*, 187 A.3d 966, 983 (Pa. Super. Ct. 2018).
[130] Glon MTD Br., Doc. 66 at 5-8.
[131] Penn State MTD Br., Doc. 65 at 24-27.

briefing, Moss, Glon, and Penn State cite *Humphries* I, this Court's later decision granting a second motion to dismiss the *Humphries* plaintiff's claims ("*Humphries* II"),[132] the Third Circuit's decision in *Kleinknecht v. Gettysburg College*,[133] and the Supreme Court of Pennsylvania's decision in *Feleccia v. Lackawanna College*,[134] all of which involve student athletes asserting that their colleges or universities owed them duties of care.

In *Humphries* I and II, this Court rejected the plaintiff's theories as to why his former football coach and Penn State owed him a duty of care, discussing both and *Feleccia* and *Kleinknecht*.[135] Relevant here, the Court rejected the plaintiff's theories that Penn State and the coach assumed a duty to care under Penn State's administrative policies and through its disciplinary decision, and that the defendants owed the plaintiff a duty by virtue of a special relationship between Penn State, the coach, and the plaintiff.[136] Moss raises similar arguments here and largely faces similar results.

Specifically, Moss counters Defendants with three arguments: that they undertook a duty to her by engaging in affirmative acts that unreasonably exposed her to the risk of harm,[137] that they owed her a duty based on a provision in Penn

---

[132] *See Humphries v. Pa. State Univ.*, 2021 WL 4355352, at *12-17 (M.D. Pa. Sept. 24, 2021).
[133] 989 F.2d 1360, 1369 (3d Cir. 1993).
[134] 215 A.3d 3 (Pa. 2019).
[135] *See* 492 F. Supp. 3d at 406-08; 2021 WL 4355352 at *6-16.
[136] *Id.* at 407.
[137] Opp., Doc. 73 at 40.

State's Student Athlete Handbook that offers student-athletes medical treatment for injuries they sustain in the course of their athletics program,[138] and that they owed a "a special 'duty to [Moss] by virtue of [her] status as a student-athlete' to protect her against 'an unreasonable risk of harm' in the fencing program"[139].

As premiered above, to the extent Moss argues that Defendants owe her a duty based on the Student Athlete Handbook, she presents the same policy-based theory this Court rejected in *Humphries*.[140] As the Court noted in *Humphries*, most "courts have found that simply enacting policies does not create new duties for entities."[141] The Court sees no reason to alter its conclusion here.

Moss' second argument that she has a special relationship with Defendants under which Defendants owe her a duty of care similarly falls flat. Moss cites to *Jordan v. Pennsylvania State University*, a Superior Court of Pennsylvania decision issued after this Court decided *Humprhies* II, for the proposition that Defendants owed her a "'special duty to [her] by virtue of [her] status as a student-athlete' to protect her against 'an unreasonable risk of harm' in the fencing program."[142] However, the *Jordan* court's statement was merely a preface to its application of a

---

[138] *Id.* at 40-41 (citing Student Athlete Handbook, Doc. 73-10).

[139] *Id.* (quoting 276 A.3d 751, 773 (Pa. Super. Ct. 2022)). Moss explains that the Court need not reach this third duty if it finds that Glon owed her a duty through his affirmative acts. *See id.* at 40 n.9.

[140] *See id.*

[141] *Id.* & n.71 (citing *Fitzpatrick v. Universal Tech. Inst., Inc.*, 2009 WL 2476639 (E.D. Pa. Aug. 13, 2009); *Millard v. Osborne*, 611 A.2d 715 (Pa. 1992)).

[142] Opp., Doc. 73 at 40 n.9 (quoting 276 A.3d 751, 773 (Pa. Super. Ct. 2022)).

much narrower specific existing duty: that colleges "provide duly licensed athletic trainers for the purpose of rendering treatment to its student athletes participating in athletic events."[143] For that proposition, the *Jordan* court cited *Feleccia*, where the Supreme Court of Pennsylvania held that the defendant-college undertook a duty to provide licensed medical staff based on its affirmative conduct, which included its custom of hiring licensed trainers, its requirement that students consent to treatment by a trainer, and its continued holding out of its staff as licensed trainers despite its knowledge that they were not licensed.[144]

Accordingly, the Court reads *Jordan* to be a straightforward application of *Feleccia* to similar facts, rather than an expansion of the *Feleccia* duty to a more general duty of care colleges owe their student athletes. Like the *Humphries* plaintiff, Moss "fail[s] to offer affirmative conduct on par with *Feleccia*."[145] She fails to allege that Defendants made the affirmative representations necessary to support the broad duties she claims Defendants owed her.[146] To the extent she argues that the Student

---

[143]  274 A.3d at 773 (quoting 215 A.3d at 15).

[144]  *See* 215 A.3d at 15.

[145]  *Id.* at *17.

[146]  Moss identifies seven duties of care Glon allegedly owed her. They are the duty to: (1) "provide her with a safe sport environment," (2) "use appropriate and functioning equipment," (3) "coach with knowledge and skills of instructional training," (4) "sufficiently supervise the athletes," (5) "warn athletes and their parents regarding safety risks on the team," (6) "provide access to proper medical care," and (7) "avoid and prevent sexual harassment and discrimination." SAC, Doc. 52 ¶ 121. All of these duties are much broader than the specific duties applied in both *Feleccia* and *Jordan*. But beyond that, Moss fails to support any of these duties with the sort of affirmative conduct that undergirded the duty of care in *Feleccia* and *Jordan*.

Athlete Handbook constitutes the affirmative representation, the Court disagrees.[147]

The Student Athlete Handbook's language provides that "[s]tudent-athletes *may*

receive medical services for athletically related injuries."[148] That conditional

language does not give rise to a mandatory legal duty.[149]

"As a result, this Court predicts that the Pennsylvania Supreme Court would

not extend its affirmative-conduct creating special relationship jurisprudence to find

a duty based on the facts that [Moss] has alleged."[150] Without a plausible direct

negligence claim against Penn State, Moss cannot sustain a direct NIED claim

against Penn State.[151] Similarly, Moss needs to adequately plead that Penn State

owes her a duty of care to sustain her negligent supervision and failure-to-train

claims.[152] As she fails to plausibly allege facts giving rise to a duty of care, her

---

[147] *See* Opp., Doc. 73 at 41-42 (citing Doc. 73-10 at 29).

[148] Doc. 73-10 at 29 (emphasis added).

[149] *See Humphries* II, 2021 WL 4355352 at *14-16 (noting that where duties of care are premised on promises to take acts, "the specificity of the promise limits the duty" (citing *Jean v. Bucknell Univ.*, 534 F. Supp. 3d 404, 414 (M.D. Pa. 2021))).

[150] *Id.* Similarly, Moss' reliance on *Baumbach v. Lafayette College* is misplaced. *See* Opp., Doc. 73 at 42 (citing 272 A.3d 83 at 89-90 (Pa. Super. Ct. 2022)). There, the Superior Court concluded that defendants, including collegiate coaches, "undertook for [t]eam members the provision of a safe environment for members to engage in crew, including providing safe and accessible parking to attend practice," reinstating claims arising out of the injury of a crew team member who was hit by a drunk driver while walking back from practice on a narrow dimly lit road. 272 A.3d at 89, 91. However, that finding was predicated in part on the coaches' knowledge that the road was dangerous and instruction to the students to use care when walking along the road. *See id.* at 89. Moss has not identified similar conduct on Glon's part.

[151] *See Toney v. Chester Cnty. Hosp.*, 961 A.2d 192, 198 (Pa. Super. Ct. 2008), *aff'd*, 36 A.3d 83 (Pa. 2011) (explaining that "[t]he crux of a[n] [NIED] claim is that [the defendant] breached some duty they owed to [the plaintiff] and that that breach injured her." (quoting *Denton v. Silver Stream Nursing & Rehab. Ctr.*, 739 A.2d 571, 578 (Pa. Super. Ct. 1999))).

[152] *See Belmont v. MB Inv. Partners*, 708 F.3d 470, 487-88 (3d Cir. 2013) ("Negligent supervision requires the four elements of common law negligence, i.e., duty, breach, causation, and damages." (citing *Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 42 (Pa. Super. Ct.

negligent supervision and failure-to-train claims also fail. Accordingly, dismissal of Moss' direct negligence claim against Penn State in Count VI, her failure to train and negligent supervision claims in Count VII, and her direct NIED claim against Penn State in Count VIII is appropriate.

### b.   Whether Glon Owed Moss A Duty Through his Own Dangerous Behavior

Moss' last argument is that Glon assumed a duty by affirmatively exposing her to harm. This time, Glon largely fails to respond to Moss' argument. Moss cites to several sections of the Restatement (Second) of Torts.[153] The Court finds a different but related provision more on point: section 321. It provides that when an individual takes an action, "and subsequently realizes or should realize that [he] has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect."[154] That rule applies even if the individual, at the time he took the act, "ha[d] no reason to believe that it will involve such a risk."[155]

In the SAC, Moss alleges that in March 2021, "Glon lied to [her], reassuring her that she was cleared to practice every day when, in reality, even three practices

---

2000))); *Oldham v. Pa. State Univ.*, 2022 WL 1528305, at *24 (M.D. Pa. May 13, 2022) (explaining that the normal negligence standard applies to failure-to-train claims because the Pennsylvania courts have not applied a more specific standard (citing *Kaminski v. Mydatt Servs. Inc.*, 2012 WL 2089741, at *4 (W.D. Pa. June 8, 2012)).

[153] Opp., Doc. 73 at 41 (citing R.2d Torts §§ 284(a), 302.

[154] R.2d Torts § 321(1).

[155] *Id.* § 321(2).

a week placed her at risk for permanent nerve damage."[156] Glon's affirmative act of lying about Moss' health undoubtedly creates a risk of physical harm.[157] Accordingly, Glon assumed the limited duty of exercising reasonable care to prevent Moss from suffering further harm in her injured condition. He failed to do so, and Moss suffered further injury as a result.[158] Therefore, Moss has stated a plausible negligence claim against Glon in Count V and the Court accordingly denies that aspect of Glon's motion to dismiss.

### c.    Moss' NIED Claim Against Glon

Having concluded that Moss states a plausible negligence claim against Glon, the Court now turns her NIED claim against him in Count VIII. As expressed above, to allege a plausible NIED claim, a plaintiff must first establish a plausible negligence claim.[159] Then, she must additionally allege "one of four elements: (1) that the [d]efendant had a contractual or fiduciary duty toward [her]; (2) that [she] suffered a physical impact; (3) that [she] was in a 'zone of danger' and at risk of an immediate physical injury; or (4) that [she] had a contemporaneous perception of tortious injury to a close relative."[160] Additionally, Moss' NIED claim must arise out

---

[156] SAC, Doc. 52 ¶ 33.
[157] The SAC does not explicitly allege that Glon knew the true extent of Moss' physical injuries, but in a light most favorable to Moss, the Court can infer from her allegation that Glon was sufficiently aware of the risk his deceit caused.
[158] *See id.* ¶ 38.
[159] *See Toney*, 961 A.2d at 198.
[160] *Doe v. Phila. Cmty. Health Alternatives AIDS Task Force*, 745 A.2d 25, 27 (Pa. Super. Ct. 2000) (citing *Brown v. Phila. Coll. of Osteopathic Med.*, 674 A.2d 1130 (Pa. Super. Ct. 1996)).

of the conduct that underlies her one valid negligence claim: Glon's deceit about her physical condition in March 2021.

With respect to the distinction between negligence and intentional conduct in tort, our Court of Appeals has commented that "intentional or reckless behavior is often relevant to showing conduct below the reasonable standard of care necessary to make out a case of negligence."[161] In support of his motion, Glon argues that Moss cannot recover for NIED because she alleges that Glon acted intentionally throughout the SAC.[162] He cites to *DiSalvio v. Lower Merion High School District*, where the Honorable Robert F. Kelly, writing for the Eastern District of Pennsylvania, dismissed an NIED claim because the "the harassment to which [defendant] allegedly subjected [plaintiff] was intentional, not negligent."[163] The *DiSalvio* plaintiff made a specific argument that he could recover on negligence claims under section 870 of the Restatement (Second) of Torts, which provides that "[o]ne who intentionally causes injury to another is subject to liability to the other for that injury."[164] Because that section only applied to intentional torts rather than negligence and because the plaintiff's complaint "clearly allege[d] that [the

---

[161] *In re Diet Drugs*, 369 F.3d 293, 312 (3d Cir. 2004).

[162] Glon MTD Br., Doc. 66 at 10-11. Glon also argues that Moss cannot recover on her NIED claim because he owes her no duty, but the Court has already addressed that argument above. *See id.* at 9.

[163] *DiSalvio v. Lower Merion High Sch. Dist.*, 158 F. Supp. 2d 553, 561 (E.D. Pa. 2001).

[164] R.2d Torts § 870; *see DiSalvio*, 158 F. Supp. 2d at 561).

defendant] acted with intent," Judge Kelly dismissed the plaintiff's negligence claims.[165]

Therefore, whether a plaintiff can recover for negligence, an intentional tort, or both, depends on the specific allegations in the complaint regarding the defendant's state of mind. Where the acts complained of are clearly intentional, as in *DiSalvio*, a plaintiff cannot recover for negligence. But where there is room for doubt, the issue must go to the jury because it turns on the actor's precise state of mind. Here, the factual allegations in the SAC suggest that Glon's deceit regarding Moss' health was motivated by his belief that Moss was weak or feigning the extent of her injury rather than an intent to further harm her, even if that was the ultimate result.[166] Accordingly, this Court cannot say that the SAC clearly alleges only intentional conduct as the pleading in *DiSalvio* did.

Having addressed Glon's argument, the Court concludes that Moss has plausibly stated an NIED claim premised on Glon's deceit. She suffered a physical impact and subsequent injury by fencing when she should not have, and she did so at least in part because Glon misled her. Accordingly, that aspect of Glon's motion to dismiss must be denied.

---

[165] *DiSalvio*, 158 F. Supp. 2d at 561.

[166] To be clear, the intent required for an intentional tort is that the actor intend the consequences of the action rather than the act itself. *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011) ("Intentional torts . . . 'as distinguished from negligent or reckless torts[,] . . . generally require that the actor intend the consequences of an act,' not simply 'the act itself.'" (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998))).

### d.   Penn State's Vicarious Liability

Penn State disclaims any vicarious liability for Glon's conduct because he wasn't acting in the scope of his employment when he verbally and physically abused Moss.[167] Moss counters that Glon's abuse was part and parcel with his coaching responsibilities.[168]

The parties appear to agree on the relevant test for actions taken within the scope of employment. An act occurs within the scope of employment if: "(1) it is of a kind and nature that the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the employer; and (4) if force is intentionally used by the employee against another, the use of force is not unexpected by the employer."[169] "The determination of whether a person was acting within the scope of his employment is typically a question for the jury."[170] But where an "employee commits an act encompassing the use of force which is excessive and so dangerous as to be totally without responsibility or reason, the employer is not responsible as a matter of law."[171]

---

[167]  Penn State MTD Br., Doc. 65 at 27-29.

[168]  Opp., Doc. 73 at 45-47.

[169]  *Costa v. Roxborough Mem'l Hosp.*, 708 A.2d 490, 493 (Pa. Super. Ct. 1998) (quoting *Fitzgerald v. McCutcheon*, 410 A.2d 1270, 1272 (Pa. Super. Ct. 1979)).

[170]  *Id.* (citing *Straiton v. Rosinsky*,133 A.2d 257, 259 (Pa. Super. Ct. 1957)).

[171]  *Id.* (quoting *Fitzgerald*, 410 A.2d at 1272). There's no dispute that Glon's conduct occurred within the authorized space and time limits of his employment.

Penn State argues that Glon's conduct, as alleged in the SAC, was not the kind he was employed to engage in because Moss alleges that Glon's tactics were ultimately unsuccessful, they "did *not* get results and did *not* lead to wins."[172] Moss responds that even if Glon's acts were ultimately didn't lead to successful results, they were "*intended* to do so."[173] But that's a question germane to the third element of the scope-of-employment analysis rather than the first, which concerns what Penn State hired Glon to do, not what Glon did to serve Penn State.[174]

As to the first element, the parties' arguments on Moss' Title IX claims set the stage for the Court's analysis. Penn State specifically argues that if Glon's conduct constitutes sexual harassment, as Moss alleges with respect to her Title IX claim, then it's not the type of conduct Penn State hired Glon to perform because it has no relationship to his duties as a coach and violates Penn State's own internal policies.[175] In support, Penn State cites *Vnuk v. Berwick Hospital Co.*, where my colleague, the Honorable Robert D. Mariani, granted a hospital's motion to dismiss a sexual harassment against it because its employee's sexual misconduct was not in the scope of his job as a physician and violated the hospital's internal policies.[176]

---

[172] Penn State MTD Br., Doc. 65 at 28-29 (emphasis in original).

[173] Opp., Doc. 73 at 47 (emphasis in original).

[174] Indeed, the Court concludes that Moss has plausibly alleged that Glon acted abusively at least in part to serve Penn State.

[175] Penn State Reply, Doc. 76 at 3 (citing *Vnuk v. Berwick Hosp. Co.*, 2015 WL 4984974, at *9 (M.D. Pa. Aug. 19, 2015) (Mariani, J.)).

[176] 2015 WL 4984974 at *9 ("Plaintiff has put forth no allegations that [the physician's] sexual harassment served the [h]ospital's interests, or even that [the physician] believed that it could serve the [h]ospital's interests.").

In response, Moss cites several decisions in which courts concluded that discriminatory employment decisions were taken in the scope of employment.[177] But those cases are distinguishable. Each involved more discrete employment actions than those present in this litigation.[178] Glon's course of abusive conduct cannot be reduced to the actions present in the cases Moss cites. His actions were not contractually obligated or part of his job description. To put a finer point to it, the Court acknowledges that a university employing coaches—especially for Division I sports—can expect them to inflict *some* level of emotional distress on student-athletes to improve their performance. For better or worse, that's the nature of the game. But it doesn't follow that every abusive action a coach takes in furtherance of his mission is conduct that he was employed to engage in.

In sum, Moss can't have it both ways. She has plausibly alleged that Glon's abuse was predicated on his misogynistic views rather than her fencing performance. Had she done the opposite, the Court would likely do the same and dismiss her Title IX claim but sustain her state-law vicarious liability claim. But the Court cannot conclude that Penn State hired Glon to lie about about Moss' health—which is the

---

[177] Opp., Doc. 73 at 45-46.

[178] *See Brumfield v. Sanders*, 232 F.3d 376, 381-82 (3d Cir. 2000) (concluding that racially motivated false statements against the plaintiff occurred in the scope of employment because they were responsive to an investigation that the defendants were required to cooperate with); *Thomas v. Wheeler*, 2005 WL 8177219, at *6 (E.D. Pa. June 29, 2005) (noting that the defendant supervisors were "contractually responsible for performing the tasks allegedly infused with racial and retaliatory animus"); *Puchalski v. Sch. Dist. of Springfield*, 161 F. Supp. 2d 395, 410 (E.D. Pa. 2001) (similar, but involving an allegedly discriminatory decision to end the plaintiff's contract).

only permissible negligence claim at this point. Accordingly, Glon's misconduct does not fall within the scope of his employment and Penn State is not vicariously liable for it. Dismissal of Count VI is appropriate.

## IV.   CONCLUSION

As alleged in the SAC, Glon's conduct was quite improper. More importantly, it crossed the line between aggressive coaching and sexual harassment. Moss has plausibly shown that Glon harassed her, and that Penn State was aware but failed to take corrective action. In doing so, she has adequately stated a Title IX violation, an Equal Protection *Monell* claim, and a direct negligence claim against Glon. But she fails to show that Glon's acts were outrageous or in the scope of his employment as a fencing coach. For those reasons, both Penn State and Glon's motions are granted in part.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge